# ABORTION

**STATUTORY INTERPRETATION – WHETHER SECTION 20-208 OF THE HEALTH-GENERAL ARTICLE PROHIBITS NURSE PRACTITIONERS, CERTIFIED NURSE MIDWIVES, AND PHYSICIAN ASSISTANTS FROM PROVIDING MEDICATION ABORTIONS – WHETHER THE SAME STATUTE PROHIBITS PHYSICIAN ASSISTANTS FROM PERFORMING SURGICAL ABORTIONS**

January 10, 2020

*The Honorable Ariana Kelly*
*House of Delegates of Maryland*

You have requested our opinion on two questions about the requirement in State law that "[a]n abortion must be performed by a licensed physician." Md. Code Ann., Health-Gen. ("HG") § 20-208. First, you ask whether that "physicians-only" statute prohibits nurse practitioners, certified nurse midwives, and physician assistants from prescribing and providing to a patient the necessary drugs to produce a medication abortion, i.e., a regimen of two prescription drugs that a patient can take to terminate a pregnancy. Second, you ask whether the statute prohibits a physician assistant from performing a surgical abortion under a delegation agreement with a supervising physician. In our opinion, a Maryland court would likely conclude, as to your first question, that nurse practitioners, certified nurse midwives, and physician assistants may provide medication abortions but that, as to your second question, only physicians, not physician assistants, may perform surgical abortions.

As to medication abortions—which were not yet available in the United States when HG § 20-208 was enacted—the statute's text is ambiguous. Although the word "abortion" in isolation may be most often understood to include all methods of inducing the termination of a pregnancy, the phrase "an abortion must be performed," when read as a whole and in context, seems to have a narrower surgical connotation. After all, one would not ordinarily say that a health care practitioner has "performed" an abortion merely by prescribing drugs that the patient then chooses to take herself. At the very least, there is some ambiguity about whether the language of the statute should be read to apply to medication abortions, such that a Maryland court would likely turn to other indicia of the General Assembly's intent, including the legislative history, the historical context, and the legislative purpose to determine the meaning of the statute. And here all of those indicia

3

suggest that the Legislature intended HG § 20-208 to apply only to surgical abortions—the only safe abortion method available in Maryland at the time—not to erect barriers for women to access future abortion methods that could be safely and effectively provided by health care practitioners other than physicians. In fact, reading the ambiguous language of HG § 20-208 to extend to medication abortions seems inconsistent with the overall goal of Maryland's abortion statute to protect access to safe abortions, *see* HG § 20-209, and might even raise constitutional questions about whether the statute imposes an undue burden on abortion access— questions that a Maryland court would likely interpret the statute to avoid. Thus, although the answer is not free from doubt, we think a Maryland court would likely find that HG § 20-208 does not apply to medication abortions.

As to surgical abortions, however, the language of the statute is clear that they "must be performed by a licensed physician" and that the definition of "physician" for purposes of that requirement does not include a physician assistant. *See* HG § 20-207 (defining "physician"). Although physicians may generally delegate certain medical acts to physician assistants, that does not transform the physician assistant into a physician as defined under the statute. To the contrary, as the Court of Special Appeals has held, the authority of physicians to delegate medical acts that they may perform under Title 14 of the Health Occupations Article generally does not negate the plain language of a statute located outside of Title 14 that expressly requires a physician to perform a particular act. *See Rideout v. Department of Pub. Safety & Corr. Servs.*, 149 Md. App. 649, 657-58 (2003). Given *Rideout* and the express language of the physicians-only statute, we think a Maryland court would likely hold that HG § 20-208 prohibits a physician assistant from performing a surgical abortion. The statute would not, however, prohibit a physician assistant from performing certain tasks under a delegation agreement during a surgical abortion in which a physician is personally involved.

# I
# Background

## A.  *Maryland's Abortion Statute*

In 1867, the General Assembly first made it a crime "to produce abortion at any stage of pregnancy, by prescribing medicines, or by any other means," but exempted "the production of abortion by a regular practitioner when deemed necessary for the

safety of the mother."[1] 1867 Md. Laws, ch. 185, § 11. That statute was repealed and re-enacted the following year, making it a crime to publicize, sell, or use "for the purpose of producing abortion . . . any poison, drug, mixture, preparation, medicine or noxious thing or instrument of any kind whatever." 1868 Md. Laws, ch. 179. Exempted, again, was "the production of abortion by a regular practitioner when, after consulting with one or more respectable physicians, he shall be satisfied that the fetus is dead, or that no other method will secure the safety of the mother." *Id.* Thus, under that scheme, abortion of a live fetus by any means was illegal, and physicians could intervene only as a last resort for the safety of the mother.

A century later, in 1968, the Legislature relaxed the law's requirements at least somewhat to permit a licensed physician to "terminate a human pregnancy" under additional circumstances. 1968 Md. Laws, ch. 470. More specifically, a physician could terminate a pregnancy if the termination took place in an accredited and licensed hospital and one or more of the following conditions existed:

    (1) Continuation of the pregnancy is likely to result in the death of the mother;

    (2) There is a substantial risk that continuation of the pregnancy would gravely impair the physical or mental health of the mother;

    (3) There is substantial risk of the birth of the child with grave and permanent physical deformity or mental retardation;

    (4) The pregnancy resulted from a rape committed as a result of force or bodily harm or threat of force or bodily harm and the states' attorney [in the jurisdiction] in which the rape occurred has informed the hospital abortion review authority in writing over his signature that there is

---

[1] Although this enactment referred to a "regular practitioner," it appears that the Legislature was referring to what we would now call a physician. In fact, as part of the same enactment, the Legislature created an early licensing scheme for physicians, responding to concerns that "mere imposters" were practicing medicine without proper education. 1867 Md. Laws, ch. 185.

> probable cause to believe that the alleged
> rape did occur.

*Id.* But, even then, a physician could terminate a pregnancy only before 26 weeks of gestation and only if authorization had been granted in writing by an abortion review authority appointed by the hospital. *Id.* It also remained a misdemeanor to sell or give "any drug, medicine, preparation, instrument, or device for the purpose of causing, inducing, or obtaining a termination of human pregnancy" other than by a licensed physician in a hospital. *Id.*

The legal landscape changed again in 1973 when the Supreme Court issued its landmark decision in *Roe v. Wade*, 410 U.S. 113 (1973). In *Roe*, the Court found unconstitutional a statute that had prohibited abortions at any stage of pregnancy except to save the life of the mother. *Id.* at 164. The Court explained that the constitutional right of privacy was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. At the same time, however, the Court recognized the State's interests "in safeguarding health, in maintaining medical standards, and in protecting potential life." *Id.* at 154. In sum, the Court held that, until the fetus is viable, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician," while the State, "if it chooses, [may] regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.* at 164. Once the fetus is viable, however, the Court held that the State may proscribe abortion "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 164-65.[2] The Court also held that the State could "proscribe any abortion by a person who is not a physician" and could define the term "'physician' . . . to mean only a physician currently licensed by the State." *Id.* at 165. Based on *Roe*, lower courts struck down much of Maryland's abortion statute that same year. *See Vuitch v. Hardy*, 473 F.2d 1370 (4th Cir. 1973); *State v. Ingel*, 18 Md. App. 514 (1973). But the statute was not amended at the time to repeal the unconstitutional provisions.

---

[2] Although *Roe* established a "trimester framework" for evaluating abortion restrictions, the Supreme Court later rejected that precise approach without disturbing *Roe*'s essential holding. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 872-73 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.). Now, when evaluating whether an abortion restriction violates the federal Constitution, the Court uses an "undue burden analysis" that asks whether the abortion restriction has "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion." *Id.* at 878.

In 1991, the General Assembly enacted the current abortion statute, which both repealed the provisions that had been rendered unconstitutional by *Roe* and in large part codified the *Roe* decision. *See* 1991 Md. Laws, ch. 1. In doing so, the Legislature declared that, "[e]xcept as otherwise provided in this subtitle, the State may not interfere with the decision of a woman to terminate a pregnancy" either before "the fetus is viable" or, even after viability, if (1) "[t]he termination procedure is necessary to protect the life or health of the woman" or (2) "[t]he fetus is affected by genetic defect or serious deformity or abnormality." HG § 20-209(b). The statute also provides that the Maryland Department of Health may adopt regulations governing abortion only to the extent that those regulations are "both necessary and the least intrusive method to protect the life or health of the woman" and "not inconsistent with established medical practice." HG § 20-209(c). However, consistent with the Supreme Court's statement in *Roe* that states could permissibly provide that only physicians may perform abortions, 410 U.S. at 165, the statute requires that "[a]n abortion must be performed by a licensed physician." HG § 20-208. The statute also specifically defines "physician" for purposes of that requirement as "any person, including a doctor of osteopathy, licensed to practice medicine in the State of Maryland in compliance with the provisions of Title 14 of the Health Occupations Article." HG § 20-207.

In addition to the physicians-only requirement at issue, Maryland's abortion statute contains two other provisions that may be relevant to your inquiry. First, a physician "is not liable for civil damages or subject to criminal liability for a *decision* to perform an abortion under [HG § 20-209] made in good faith and in the physician's best medical judgment in accordance with accepted standards of medical practice." HG § 20-209(d) (emphasis added).[3] Second, "a physician may not perform an abortion on an unmarried minor unless the physician first gives notice to a parent

---

[3] Our Office has previously questioned the practical effect of this provision. *See* Bill Review Letter for S.B. 162 at n.3 (Feb. 18, 1991). Because there is no longer any criminal penalty for abortion, this provision appears to apply, if at all, only in the civil context. *Id.* And even then, the provision provides immunity only in cases where a physician has made the decision to perform an abortion "in accordance with accepted standards of medical practice"—similar to the medical standard of care—and thus it may provide immunity only in cases where the physician could not be found liable in any event. *Id.* The immunity also applies only to the physician's *decision* to perform the abortion, not the physician's conduct in actually performing the abortion itself.

or guardian of the minor" or unless one of a series of exceptions applies.  HG § 20-103.  The exceptions to that parental-notification requirement permit a physician to proceed without giving notice, i.e., to bypass the parent or guardian, if either (1) the minor does not live with the parent or guardian and a reasonable effort to give notice is unsuccessful or (2) in the professional judgment of the physician:  (a) notice may lead to physical or emotional abuse of the minor; (b) the minor is mature and capable of giving informed consent to an abortion; or (c) notification would not be in the best interest of the minor.  *Id*.[4]  The General Assembly first added the predecessor of this parental-notification provision in 1977 but with a less robust bypass procedure.  *See* 1977 Md. Laws, ch. 961.  In 1985, our Office concluded that the original bypass procedure was insufficient and, as a result, unconstitutional.  70 *Opinions of the Attorney General* 3, 12 (1985).  When the Legislature later amended the rest of the abortion statute in 1991, it also remedied the constitutional deficiency in the parental-notification provision by adding new exceptions to the notice requirement, thereby making the requirement enforceable.

### B.   *Methods of Abortion*

In 1991, the only safe and effective method of abortion available in the United States was surgical.  As we understand it, there are two types of surgical abortion.  The term surgical abortion most often refers to an aspiration abortion, which is a procedure that may be performed up to 14 to 16 weeks of gestation.  *See* Nat'l Academies of Sciences, Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 8 (2018).  The term may also refer to a procedure called dilation and evacuation ("D&E"), which is performed between 14 and 20 weeks of gestation.  Performing the D&E procedure—also known as a second-trimester surgical abortion—"requires advanced training and/or experience."  *Id*. at 62-63.

---

[4] This parental-notification provision is itself an exception to the general rule that a physician need not provide notice to a parent about pregnancy-related treatment for a minor.  *See* HG § 20-102.  Under that general provision, a minor has the same capacity as an adult to consent to, among other things, "[t]reatment for or advice about pregnancy," HG § 20-102(c), and "a licensed health care practitioner may, but need not, give a parent . . . information about treatment needed by the minor or provided to the minor . . . *except information about an abortion*," HG § 20-102(f) (emphasis added).  Notification about abortion is instead governed by HG § 20-103.

The term "medication abortion," as we understand it, usually refers to a regimen of two prescription drugs. The first drug is mifepristone, which did not become available in the United States until 2000, when the U.S. Food and Drug Administration ("FDA") approved it as safe and effective under the brand name Mifeprex. Mifepristone, which is sometimes known as the "abortion pill," works by blocking a hormone called progesterone, thereby causing the lining of the uterus to thin and preventing the embryo from staying implanted and growing. *See* Mayo Clinic, *Medical Abortion* (July 7, 2018), https://www.mayoclinic.org/tests-proceduresmedical-abortion/about/pac-20394687. The second drug is misoprostol, which causes the uterus to contract and to expel the embryo through the vagina. *Id.* Typically, the patient will self-ingest the pill containing mifepristone in the office of the prescribing health care practitioner and will then take misoprostol on her own at home (or another location appropriate for the patient) 24 to 48 hours later. *See* FDA, Mifeprex (Mifepristone) Information (Feb. 5, 2018), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information. Patients can take these drugs through 10 weeks of gestation to produce a medication abortion.[5] *Id.*

The FDA, after approving Mifeprex, established a Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone, limiting the distribution of mifepristone to certified prescribers in specified health care settings. *Id.* Under the original REMS, mifepristone had to be provided "by or under the supervision of a physician" who met certain qualifications, including:

(1) Ability to assess the duration of pregnancy accurately.

(2) Ability to diagnose ectopic pregnancies.

(3) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

---

[5] By medication abortions, we do not mean to refer to emergency contraceptives, like the so-called "morning after pill," which are available over the counter to prevent a pregnancy, rather than to terminate one.

*Id.*; *see also* FDA, Risk Evaluation and Mitigation Strategy for Mifepristone (June 8, 2011), https://www.accessdata.fda.gov/ drugsatfda_docs/rems/Mifeprex_2011-06-08_Full.pdf.

In 2016, however, the FDA revised its REMS for mifepristone. *See* FDA, Mifeprex (Mifepristone) Information (Feb. 5, 2018); *see also* Risk Evaluation and Mitigation Strategy for Mifepristone (April 11, 2019), https://www.accessdata.fda.gov/ drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Full.pdf (setting out the current REMS). Now, at least for purposes of federal law, mifepristone no longer needs to be provided by or under the supervision of a physician, but rather may be provided "by or under the supervision of a *healthcare provider who prescribes*" and who has the ability to assess the duration of pregnancy, to diagnose ectopic pregnancies, and to provide surgical intervention directly or through others. FDA, Mifeprex (Mifepristone) Information (Feb. 5, 2018) (emphasis added). Mifepristone must, however, be dispensed to the patient only in clinics, medical offices, and hospitals, not in retail pharmacies. *Id.*[6]

The FDA's decision to amend its REMS to authorize the provision of mifepristone by any "healthcare provider who prescribes," not just a physician, was consistent with the consensus in the medical community that physicians are not the only health care providers who can safely prescribe and provide to the patient

---

[6] For purposes of this federal requirement, "dispense" appears to include the "act of delivering a prescription drug to a patient . . . [b]y a licensed practitioner or an agent of a licensed practitioner, either directly or indirectly, for self-administration by the patient." 21 C.F.R. § 208.3(b). That definition is somewhat different than the definition of "dispense" under Maryland law, which is "the procedure which results in the receipt of a prescription or nonprescription drug or device by a patient or the patient's agency and which entails the: (1) [i]nterpretation of an authorized prescriber's prescription for a drug or device; (2) [s]election and labeling of the drug or device prescribed pursuant to that prescription; and (3) [m]easuring and packing of the prescribed drug or device in accordance with State and federal laws." HO § 12-101(j). In fact, the federal definition of dispense appears to encompass what is understood in Maryland to be the "administering" of a prescription drug. *See* HO § 12-102(e)(2) (defining "administering" to mean "the direct introduction of a single dosage of a drug or device at a given time, whether by injection or other means, and whether in liquid, tablet, or capsule, or other form"). In any event, regardless of the precise definition of the term dispense under the REMS, the point is that mifepristone must be provided to the patient in the clinic, medical office, or hospital. It is our understanding that misoprostol, however, can be dispensed in retail pharmacies.

the necessary drugs to produce a medication abortion. Indeed, studies have concluded that nurse practitioners, certified nurse midwives, and physician assistants all "can provide medication and aspiration abortions safely and effectively" when they are trained to do so. Nat'l Academies of Sciences, *The Safety and Quality of Abortion Care in the United States*, at 14; *see also* Am. Pub. Health Ass'n, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 1, 2011).[7]

## C.  Maryland's Health Occupations Article

The Health Occupations Article sets forth the scopes of practice for physicians, nurse practitioners, certified nurse midwives, and physician assistants. Title 14 governs the practice of medicine by physicians. The practice of medicine includes, among other things, "[d]iagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment," and, of particular relevance here, the "[e]nding of a human pregnancy." Md. Code Ann., Health Occ. ("HO") § 14-101(o)(2). A physician may also "personally prepar[e] and dispens[e]" the physician's own prescriptions if the physician has obtained a dispensing permit from the Board of Physicians (or may dispense starter doses or samples without a dispensing permit if the physician does not charge for them). HO § 12-102(c)(2); *see also* HO § 12-102(d), (f).[8]

With limited exceptions, a license is required to practice medicine, *see* HO §§ 14-301, 14-601, and any person who attempts to practice medicine without a license is subject to a fine, imprisonment, or both. HO § 14-606. That said, Title 14 "does not limit the right of . . . [a]n individual to practice a health occupation that the individual is authorized to practice" under the Health Occupations Article. HO § 14-102. That proviso is important because, as other health occupations have evolved over time, the

---

[7] https://www.apha.org/policies-and-advocacy/public-health-policy - statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants

[8] A physician also does not need a dispensing permit to dispense prescription drugs in the course of treating a patient "at a medical facility or clinic that is operated on a nonprofit basis," "[a]t a health center that operates on a campus of an institution of higher education," or "[a]t a public health facility, a medical facility under contract with a State or local health department, or a facility funded with public funds." HO § 12-102(g).

scopes of practice for those occupations have begun to overlap in certain ways with the practice of medicine that had previously been reserved for physicians. Here, we focus on the scopes of practice for nurse practitioners, certified nurse midwives, and physician assistants, respectively, as those are the three categories of clinicians about whom you have asked.

The practice of nurse practitioners is broad and expressly includes prescribing and administering drugs. *See* HO § 8-101(m)(1), (5), (o)(2)(v). In fact, as far back as 1981, nurse practitioners were given the authority to prescribe drugs under certain conditions based on regulations adopted jointly by the Board of Nursing and Board of Physicians. *See* Md. Code Ann., Art. 43, § 122 (1957, 1980 Repl. Vol.) (authorizing the boards to adopt such regulations); *see also* 8:5 Md. Reg. 473 (Mar. 6, 1981) (adopting the regulations); 7:21 Md. Reg. 2012 (Oct. 17, 1980) (proposing the regulations). Since 2010, because of statutory changes designed to provide more independence to nurse practitioners, the regulations under which such nurse practitioners prescribe drugs have been adopted solely by the Board of Nursing. *See* 2010 Md. Laws, ch. 77. In 1993, the Legislature also granted nurse practitioners the additional authority to dispense any drug they were "authorized to prescribe" and "to the extent permitted by law" in the course of treating patients at certain types of facilities. HO § 8-508(c); COMAR 10.27.07.03A(11); COMAR 10.27.07.07; *see also* 1993 Md. Laws, ch. 454. Nurse practitioners may also operate independently from physicians, at least after an initial 18-month period during which they must "consult and collaborate" with either a physician or a nurse practitioner who serves as a mentor. *See* HO § 8-302.1(d)(1); *see also* HO § 8-101(j) (defining "mentor" as a certified registered nurse practitioner or licensed physician who has three or more years of clinical practice experience).

The practice of certified nurse midwives (who are, as we understand it, a special subcategory of nurse practitioners) consists of the "management and care of essentially normal newborns and of essentially normal women" before, during, and after childbirth. HO § 8-601(1).[9] In 1990, certified nurse midwives were first given the authority to prescribe "substances commonly used in the practice of nurse midwifery"—as determined by the State Board of Nursing in consultation with the State Board of Pharmacy and State Board of Physicians—and to dispense those substances in the

---

[9] This opinion does not address "direct-entry midwives," who are distinct from certified nurse midwives. *See* HO § 8-6C-02.

course of treating patients at certain facilities.  HO § 8-601(2); *see also* 1990 Md. Laws, ch. 352.  In 2017, the General Assembly eliminated the requirement that the Board of Nursing consult with the Board of Pharmacy and the Board of Physicians to determine the extent of certified nurse midwives' prescription authority.  *See* 2017 Md. Laws, ch. 515.

Finally, unlike nurse practitioners and certified nurse midwives, physician assistants may only practice under a physician's supervision, in accordance with a delegation agreement entered into with the physician.  More specifically, physician assistants may perform medical acts that are (1) delegated by the supervising physician; (2) appropriate to the education, training, and experience of the physician assistant; (3) customary to the practice of the supervising physician; and (4) consistent with the delegation agreement filed with the Board of Physicians.  HO § 15-301(b).  In 1986, the General Assembly first outlined the "patient services" that physician assistants could provide—such as taking patient histories and performing physical examinations—under an approved "job description" from the Board of Physicians.  *See* 1986 Md. Laws, ch. 759.  Although that statute broadly stated that physician assistants could also perform "other medical acts" that were "permitted to be delegated" under a job description approved by the Board of Physicians, *id.*, it is our understanding that the Board of Physicians did not permit the delegation of prescription authority at the time.

In 1999, however, the Legislature broadened the authority of physician assistants by replacing the requirement that they have a "job description" with the requirement to have a "delegation agreement" on file with the Board of Physicians and by expressly authorizing physician assistants to prescribe and administer drugs under a delegation agreement with a supervising physician as long as the delegation agreement includes certain provisions and the physician assistant meets certain professional qualifications.  HO § 15-301(c)(7); *see also* HO § 15-302.2; 1999 Md. Laws, ch. 655. When a delegation agreement allows a physician assistant to perform so-called "advanced duties," however, the Board of Physicians must specifically authorize those duties.  HO § 15-302(c); *see also* COMAR 10.32.03.02B(2) (defining "advanced duties" to mean "medical acts that require additional training beyond the basic physician assistant education program required for licensure").  Finally, in 2018, the Legislature further authorized physician assistants to personally prepare and dispense certain drugs if (1) the supervising physician possesses a dispensing permit

when required to have such a permit; and (2) the physician assistant only dispenses drugs within the supervising physician's scope of practice and the scope of the delegation agreement. HO § 15-302.2(c); *see also* 2018 Md. Laws, ch. 442, 443.

## II
## Analysis

### A.  *Medication Abortions*

Your first question is whether HG § 20-208 prohibits nurse practitioners, certified nurse midwives, and physician assistants from prescribing and providing to a patient the necessary drugs to produce a medication abortion. It is clear that these non-physicians have authority to prescribe drugs, at least as a general matter. *See, e.g.*, HO §§ 8-508, 8-601, 15-301. They also have at least general authority to dispense and administer prescription drugs.[10] *See, e.g.*, HO §§ 8-101, 8-508, 8-601, 15-302.2. The question, then, is whether the requirement that "[a]n abortion must be performed by a licensed physician," HG § 20-208, means that—even when these practitioners would be acting within their scopes of practice under the Health Occupations Article—they cannot prescribe and provide

---

[10] Depending on the protocol used, it appears that providing a medication abortion might involve the "administering" of drugs, the "dispensing" of drugs, or both under Maryland law. For example, when a health care practitioner provides mifepristone directly to a patient to self-ingest in a clinic, medical office, or hospital, that may qualify as "administering" the drug. *See* HO § 12-102(e)(2) (defining "administering" as "the direct introduction of a single dosage of a drug or device at a given time, whether by injection or other means, and whether in liquid, tablet, or capsule, or other form"). But when a health care practitioner packages and provides misoprostol (i.e., the second drug in the protocol) to a patient for the patient to take at home, that may qualify as "dispensing." *See* HO § 12-101(j). Regardless of the exact protocol used, however, the health care practitioners at issue have at least general authority both to dispense and administer prescription drugs, so long as they are acting within their scopes of practice and in compliance with any limits imposed by their licensing statutes. To the extent that the licensing statutes impose more stringent restrictions on dispensing drugs than on administering them, we need not decide which of those two acts would be involved or how the licensing statutes would be applied in specific cases. Instead, to answer your question, we need only focus on whether HG § 20-208 categorically prohibits non-physicians from providing medication abortions. If not, it will be up to the Board of Nursing and Board of Physicians to clarify any uncertainty about the difference between dispensing and administering as applied to the practitioners they regulate.

to a patient drugs that, if taken by the patient as directed, result in the termination of a pregnancy.

In answering that question, "[t]he cardinal rule," as always, "is to ascertain and effectuate the real and actual intent of the Legislature." *State v. Bey*, 452 Md. 255, 265 (2017) (internal quotation omitted). Here, however, that task is more complicated than usual because of subsequent developments in the medical field that the Legislature did not anticipate. After all, when HG § 20-208 was enacted, the only safe and effective method of abortion available in the United States was surgical. Thus, at least at that time, a surgical abortion was the only "abortion" that a health care practitioner in Maryland would have possibly "performed," and physicians were the only practitioners in Maryland who would have been able to provide that type of abortion. But the fact that medication abortions were not available in Maryland in 1991 is not, by itself, dispositive. Although a court "may consider the circumstances existing and events occurring at the time of the statute's passage," it must also "consider that our laws are addressed to the future." *Kindley v. Governor of Maryland*, 289 Md. 620, 625 (1981). And when a statute "is phrased in broad general terms," that often "suggests that the legislature intended the provision to be capable of encompassing circumstances and situations which did not exist at the time of its enactment." *Id*. Keeping that in mind, our task is to use the ordinary tools of statutory interpretation to determine whether the Legislature intended HG § 20-208 to regulate only the particular method of terminating a pregnancy that physicians could safely and effectively perform in the United States at the time—that is, surgical abortions—or to extend to other methods of terminating a pregnancy found to be safe and effective in the future regardless of how the medical field and medical science might evolve.

Using those ordinary tools of statutory interpretation, we begin with "the normal, plain meaning of the statute." *Bey*, 452 Md. at 265. If the words of the statute, read in context, are both "unambiguous and clearly consistent with the statute's apparent purpose," our inquiry usually ends there. *Id*. "[E]ven when the words of the statute are crystal clear" in the abstract, however, there may still be ambiguity when the "application" of those words "in a given situation is not clear." *University Sys. of Maryland v. Baltimore Sun Co.*, 381 Md. 79, 93 (2004) (internal quotation omitted). If the statutory language is indeed ambiguous either on its face or as applied to a given situation, we then turn to other indicia of legislative intent, including the legislative history, the

purpose of the statute, and the "relative rationality and legal effect of various competing constructions," to help determine the meaning of the statute. *Witte v. Azarian*, 369 Md. 518, 525-26 (2002).

Although the language of the statute here seems deceptively simple—"[a]n abortion must be performed by a licensed physician," HG § 20-208—there is considerable ambiguity in that language as applied to medication abortions. To be sure, medication abortions are abortions in at least some sense of the word; they are, after all, called medication *abortions*. But the statute does not define "abortion" or tell us how the Legislature intended the term to be understood here. So in the absence of any express statutory definition, we turn to dictionary definitions as "a useful starting point for determining what [the term] means, at least in the abstract." *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997) (explaining that dictionary definitions provide a "starting point" but are not dispositive). And those definitions reveal that the word "abortion" does not have a single, settled meaning that applies in all cases or in all contexts. Although abortion is perhaps most often defined to mean something like the "artificially induced termination of a pregnancy," *MacMillan Dictionary* 3 (1987), or the "artificially induced termination of a pregnancy for the purpose of destroying an embryo or fetus," *Black's Law Dictionary* 6 (2009)—definitions which would include a medication abortion—those are not the only recognized meanings of the term. Instead, depending on context, "abortion" can also have a narrower meaning that is limited to *surgical* procedures that result in the termination of a pregnancy. *See, e.g.*, *Webster's Encyclopedic Unabridged Dictionary* 6 (1996) (including, as one definition of abortion, "any of various surgical methods for terminating a pregnancy"); *The Random House Dictionary of the English Language* 6 (1987) (same); *see also* Conn. Op. Att'y Gen. No. 2001-015, 2001 WL 790037 (July 2, 2001) (concluding that, in the context of Connecticut's physicians-only requirement, "abortion" meant a surgical abortion, not the act of prescribing drugs).

Thus, regardless of what the word "abortion" most often means in the abstract, we must interpret the statute at issue as a whole and in context to determine the Legislature's intent. *See, e.g.*, *Stoddard v. State*, 395 Md. 653, 663 (2006) ("[T]he meaning of the plainest language is controlled by the context in which it appears." (internal quotation omitted)); *see also, e.g., Marriott Employees Fed. Credit Union*, 346 Md. at 448 (reading a statutory term "in conjunction with" the surrounding language). And when

read as a whole, the language providing that "[a]n abortion must be performed by a licensed physician," HG § 20-208, seems to have more of a surgical connotation, because the word "perform" is more naturally used in ordinary parlance in conjunction with a surgical procedure than with the mere act of prescribing and providing to a patient drugs that the patient will take herself. *See, e.g.*, *The American Heritage Dictionary of the English Language* 1345 (3d ed. 1996) (defining "perform" as "[t]o begin and carry through to completion," as in "[t]he surgeon performed the operation"); *The American Heritage Dictionary* 921 (2d College ed. 1991) ("[t]o begin and carry through to completion," as in to "perform surgery"); *MacMillan Dictionary* 748 (1987) ("to begin and carry out to completion," as in "[a] noted surgeon performed the operation"); *Webster's New World Dictionary of the English Language* 1056 (2d College ed. 1978) ("to act on so as to accomplish or bring to completion").

To illustrate what we mean, unlike a surgical abortion, during which a physician is responsible for performing the operation from start to finish, a medication abortion is not something that a health care practitioner "carr[ies] out" to "completion" or perhaps even "carr[ies] out" at all. Rather, after a health care practitioner provides the necessary drugs to the patient, the patient is the one who ultimately chooses to put the first drug (containing mifepristone) in her own mouth and then, 24 to 48 hours later, takes the second drug (containing misoprostol) on her own, typically at home. That reality makes the statutory language an awkward fit if the General Assembly intended the physicians-only requirement to apply to all methods of terminating a pregnancy, even via drugs or medicines that the patient takes herself. Although the word "perform" can have other broader definitions, such as to "do," *see, e.g.*, *Webster's New Universal Unabridged Dictionary* 1439 (2003), there is at the very least some ambiguity about whether, given the use of the word "performed" in HG § 20-208, the Legislature intended the provision to extend to medication abortions.

To resolve this ambiguity, a court would turn to other indicia of legislative intent, such as the legislative history, the historical context, and the statutory purpose. As an initial matter, the legislative history and historical context here suggest that HG § 20-208 does not apply to medication abortions. Whereas prior versions of the statute specifically made it illegal to "*produce* abortion . . . by *prescribing medicines*, or by any other means," 1867 Md. Laws, ch. 185 (emphasis added), or to sell or give "any

*drug*, *medicine*, preparation, instrument, or device for the purpose of *causing*, *inducing*, or *obtaining* a termination of human pregnancy," 1968 Md. Laws, ch. 470 (emphasis added), that broader language was notably absent from the 1991 abortion statute. Instead of that broad prior language, which would have applied to surgical and medication abortions alike, the Legislature chose to require only that, if an "abortion" is "performed," then it must be performed by a "licensed physician." HG § 20-208. That narrower choice of language was no accident; it reflects the Legislature's explicit decision after *Roe* to shift from a statutory scheme that had, with limited exceptions, broadly criminalized the termination of a pregnancy—regardless of the method used—to an entirely different statutory scheme that protects access to safe abortions under *Roe*. In fact, as explained during the floor debates over the 1991 bill, the General Assembly intentionally abandoned the broader language that proscribed selling or giving "drugs" to "caus[e]" or "induc[e]" the termination of a pregnancy because that language was "unnecessary" in light of *Roe* and in light of other provisions of law that already required individuals to "be licensed" to sell drugs and already prohibited individuals from practicing medicine without a license. Senate Floor Debate, S.B. 162, 1991 Leg., Reg. Sess.; *see also, e.g.*, HO § 14-601 (prohibiting the unauthorized practice of medicine).

Thus, the decision to abandon the prior language that had specifically applied to drugs and had specifically prohibited the "causing" or "inducing" of an abortion implies that the Legislature was narrowly focused in HG § 20-208 on the only safe and effective method of abortion that physicians could "perform" at the time—that is, surgical abortions—and was leaving the regulation of drugs that could be used to terminate a pregnancy to other existing provisions of law. In other words, although prior versions of the statute may have prohibited non-physicians from prescribing drugs to cause or induce an abortion, the 1991 abortion statute was intended as a departure from those prior versions, as evidenced by its far narrower language. *See, e.g.*, *Barr v. Barberry Bros.*, 99 Md. App. 33, 40 (1994) (recognizing that "when substantive changes are made it indicates an intent to change the meaning of that statute" (internal quotation omitted)). Rather than carry forward language from the prior versions, the Legislature sought to "erase any form of language that contradict[ed] the purpose of *Roe v. Wade* . . . [and] any antiquated language that predate[d] the present practice." Senate Floor Debate, S.B. 162, 1991 Leg., Reg. Sess. The legislative history and historical context of HG § 20-208 thus support reading the statute not to apply to medication abortions.

Similarly, the purpose behind the physicians-only requirement, as well as the 1991 abortion statute more generally, suggests that the Legislature did not intend for HG § 20-208 to apply to medication abortions. *See Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 513 (1987) (explaining that, when a statute is ambiguous, a court considers "not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment" (internal quotation omitted)). As explained by our Office in an opinion about the 1968 abortion statute, the purpose of the physicians-only requirement as it existed at that time was to "protect the health and lives of women by requiring abortions to be performed only by licensed physicians, who presumably have the requisite skill." 56 *Opinions of the Attorney General* 237, 242 (1971). Although much of the 1968 abortion statute was later struck down as unconstitutional after *Roe v. Wade*, the basic purpose of the physicians-only requirement as it was enacted in 1991 seems to be the same: to protect the health and lives of women seeking abortions.

Given that purpose, the Legislature presumably sought to require that physicians "perform[]" abortions because physicians were the only persons then qualified to provide what was at the time the only safe and effective abortion method available in the United States, not because the Legislature was trying to limit access to future abortion methods that had yet to be approved and that could be safely and effectively provided by health care practitioners other than physicians. *Cf.* Conn. Op. Att'y Gen. No. 2001-015 (finding that the purpose of physicians-only requirement was "to protect women from undergoing surgical procedures by those untrained and unqualified individuals who were performing illegal abortions under unsanitary conditions prior to the *Roe v. Wade* decision"). In fact, the broader purposes of the 1991 abortion statute (of which HG § 20-208 was a part) were to codify *Roe v. Wade* and to protect the rights of women under *Roe* to access safe abortions, not to erect barriers to access unrelated to their health or safety. To that end, the Legislature expressly declared that, except as otherwise provided in the same subtitle, "the State may not interfere with the decision of a woman to terminate a pregnancy" before the fetus is viable and that any regulations issued by the Maryland Department of Health must be "both necessary and the least intrusive method to protect the life or health of the woman" and "not inconsistent with established medical practice." HG § 20-209(b), (c). Those provisions seem to reflect an overall intent on the part of the Legislature to protect, not unduly restrict, access to

safe abortions. *See* Wash. Op. Att'y Gen. No. 2004-1, 2004 WL 326692 (Jan. 5, 2004) (reaching a similar conclusion based on the purpose of Washington's abortion statute).

Thus, to the extent that allowing trained and licensed nurse practitioners, certified nurse midwives, and physician assistants to provide medication abortions is just as safe as allowing physicians to do so, reading HG § 20-208 as limited to surgical abortions is more consistent with the purposes behind both the physicians-only requirement and the 1991 abortion statute as a whole. *See Board of Examiners in Optometry v. Spitz*, 300 Md. 466 (1984) (finding that opticians could fit contact lenses because there was no evidence that it would thwart the purpose of the optometry statute by exposing the public to harm). And as we understand the medical consensus, there is no reason why nurse practitioners, certified nurse midwives, and physician assistants—if they are trained and are acting within their respective scopes of practice—would not be able to provide the drugs for a medication abortion safely. *See, e.g.*, Nat'l Academies of Sciences, *The Safety and Quality of Abortion Care in the United States* at 14; Am. Pub. Health Ass'n, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 1, 2011). That is particularly true now that the FDA has updated its REMS for mifepristone to authorize any "healthcare provider who prescribes" to become a certified prescriber, reflecting the consensus that other providers may safely prescribe the drug. FDA, *Mifeprex (Mifepristone) Information* (Feb. 5, 2018).

What is more, reading HG § 20-208 as applying only to surgical abortions would not leave medication abortions unregulated, nor would it permit unqualified individuals to provide drugs to terminate a pregnancy. Instead, there are other provisions of law that protect the health and safety of women in this context. For example, § 14-601 of the Health Occupations Article, which prohibits the unauthorized practice of medicine, would prevent anyone from providing drugs to terminate a pregnancy without the authority to do so under the Health Occupations Article. *See* HO § 14-101(o) (including the "[e]nding of a human pregnancy" as part of the practice of medicine). And as for those practitioners who have prescription authority under the Health Occupations Article, each professional licensing board, such as the Board of Nursing or the Board of Physicians, has the authority to regulate the health care practitioners within its jurisdiction. Those boards can thus ensure that only qualified and trained health care practitioners, acting within their scope of practice, can prescribe, dispense, or administer drugs for a medication abortion. The boards would also

be able to punish any practitioners who fail to adhere to the relevant standards of care in providing those services. *See, e.g.*, HO §§ 8-316(a)(6), 8-508(a)(2), 8-602, 14-205, 15-314.

Our conclusion that HG § 20-208 likely does not apply to medication abortions is further supported by the canon of constitutional avoidance. Under that canon, "if a legislative act is susceptible of two reasonable interpretations, one of which would not involve a decision as to the constitutionality of the act while the other would, the construction which avoids the determination of constitutionality is to be preferred." *Heileman Brewing v. Stroh Brewery*, 308 Md. 746, 763 (1987) (internal quotation omitted). Here, if a court were to interpret HG § 20-208 to apply to medication abortions, that could raise a constitutional question about whether the statute imposes an undue burden on a woman's right to choose by creating barriers to abortion access without sufficient health or safety grounds.

Indeed, in determining whether there is an undue burden, the Supreme Court has recently explained that courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016). The Court there invalidated two abortion restrictions in Texas—one requiring abortion practitioners to have admitting privileges at a hospital and the other requiring abortion facilities to meet minimum standards for ambulatory surgical centers—based on the record evidence that those restrictions offered little or no health benefits and imposed significant burdens on abortion access. In doing so, the Court reasoned that there was a lack of evidence that the first requirement furthered any discernable health benefit and that, according to the record, the requirement would lead to the closure of half of the abortion clinics in the state, thus presenting a "substantial obstacle in the path of a woman's choice." *Id.* at 2311-12. Similarly, as to the second requirement, the Court noted that it had "such a tangential relationship to patient safety in the context of abortion as to be nearly arbitrary" and that it would have further reduced the number of abortion clinics. *Id*. at 2316 (quoting the trial court). Although it is not clear that extending Maryland's physicians-only requirement to apply to medication abortions would in fact create the same type of "substantial obstacle" to abortion access in Maryland as existed in Texas, it would at the very least raise a significant constitutional question in light of the medical consensus that trained and licensed nurse practitioners, certified nurse midwives, and physician assistants can safely provide medication

abortions. And the canon of constitutional avoidance would counsel in favor of the interpretation of the statute that avoids that question, i.e., that HG § 20-208 does not apply to medication abortions.

Our conclusion is also consistent with the conclusions of most other state attorneys general to encounter similar questions under their states' abortion statutes. Those attorneys general have typically interpreted statutes like Maryland's to permit non-physician health care practitioners to provide medication abortions when those practitioners can prescribe and provide to the patient the necessary drugs under their respective licensing statutes. *See, e.g.*, Wash. Op. Att'y Gen. No. 2004-1 (concluding that physicians-only requirement did not apply to medication abortions because subsequent legislation authorized new health care practitioners to prescribe drugs); Conn. Op. Att'y Gen. No. 2001-015 (concluding that physicians-only requirement applied only to performance of surgical procedures and that certain non-physicians could thus prescribe and dispense mifepristone to the extent allowed by the FDA); Letter from Jennifer K. Brown, Director of Reproductive Rights Unit, Office of the New York Attorney General, to Donna Lieberman, New York Civil Liberties Union (June 29, 2001) (concluding that physicians-only requirement was not intended to prevent licensed, qualified health care practitioners from providing safe abortion services and thus that certain non-physicians could provide medication abortions under the supervision of a physician); *see also* Illinois Op. Att'y Gen. No. 09-002, 2009 WL 596125 (Mar. 5, 2009) (concluding that, although its physicians-only statute applied to medication abortions, it permitted certain non-physicians to dispense mifepristone under the supervision of a physician).[11]

---

[11] When state attorneys general have reached different conclusions, it was because of express language in those states' physicians-only statutes that clearly applied to prescription drugs. For example, the California Attorney General concluded, before mifepristone was even available in the United States, that only a physician could perform an abortion and that, although the question asked was about who could perform a "surgical" abortion, California law did not differentiate among abortion methods and that, therefore, the "answer [did] not depend on" the precise method of the abortion. Cal. Op. Att'y Gen. No. 90-926, 1991 WL 495463 (June 25, 1991). At the time, however, California law expressly criminalized abortion by "any medicine, drug, or substance" and "any instrument or other means whatever," except by a physician. *Id.* Similarly, the Ohio Attorney General concluded, after mifepristone became available, that nurses could not administer drugs to terminate a

The only thing that gives us pause is that there are two other provisions of the abortion statute that use the word "abortion" in conjunction with the word "perform" but that could be read to apply to medication abortions. *See Vest v. Giant Food Stores, Inc.*, 329 Md. 461, 466-67 (1993) (explaining that a statute "must be examined as a whole and the interrelationship or connection among all its provisions are considered").

The first of those provisions states that a physician is not liable for civil damages or subject to a criminal penalty for the "decision" to "perform an abortion." HG § 20-209(d). As noted above, our Office has previously questioned the practical effect of this provision because it applies only to the *decision* to perform an abortion, not the actual performance of the abortion, and seems to grant immunity only in cases when the physician likely could not be found liable in any event, given that, for immunity to attach, the decision must be made "in accordance with accepted standards of medical practice"—a requirement similar to the ordinary standard of care that applies to malpractice claims. Bill Review Letter for S.B. 162 at n.3 (Feb. 18, 1991) (quoting HG § 20-209(d)); *see also* footnote 3, *supra*. Whatever the practical effect of this provision, however, it is at least possible that the General Assembly intended the immunity to extend to a physician's decision to terminate a pregnancy, regardless of the method used.

The second provision states that a physician may not "perform an abortion" on an unmarried minor without providing notice to a parent or guardian unless an exception to that parental-notification requirement applies. HG § 20-103. Here, again, the General Assembly may have intended this provision to apply to any method of terminating a pregnancy, rather than just a surgical abortion. That is because a core purpose of the parental-notification requirement, according to its legislative history, was to ensure that, with certain exceptions, parents are aware when their child is confronted with a decision about whether to terminate a pregnancy so that the parents can help to counsel the child about that

---

pregnancy. *See* Ohio Op. Att'y Gen. No. 2005-012, 2005 WL 797074 (Mar. 31, 2005). But there a statute expressly authorized the Board of Nursing to impose disciplinary sanctions on a nurse for "prescribing any drug or device to perform or induce an abortion, or otherwise performing or inducing an abortion." *Id.* By contrast, Maryland's abortion statute— which was narrowed in 1991 to remove the prior language that had criminalized the use of drugs to cause or induce the termination of pregnancy—says none of these things.

decision—a purpose that would apply equally regardless of the method of abortion. *See* Statement to the Committee on Environmental Matters by Delegate Leo Green on H.B. 1297, 1977 Leg., Reg. Sess. (Mar. 9, 1977) (explaining, as the sponsor of the bill, that the legislation would allow parents to "fulfill one of [their] responsibilities," i.e., "that of counselling [their children] when [they have] a problem" and that the bill "would put the responsibility and privilege of helping these children back where it belongs—in the family").[12]

If those two provisions are, in fact, best read to apply to medication abortions, that could suggest that HG § 20-208 should be read the same way, because courts will generally presume that the same words used in different parts of the same statutory scheme have the same meaning, unless "it is apparent . . . that they were employed in different parts with a different intent." *Whack v. State*, 338 Md. 665, 673 (1995); *see also National Corp. for Housing Partnership v. Keller*, 353 Md. 171, 185 (1999) (stating that "where the same language is used in different clauses of the constitution or statute, upon the same or similar subjects, it must receive the same construction, unless some particular reason to the contrary can be signed" (internal quotation and alteration omitted)). But ultimately, although it is beyond the scope of this opinion to offer a definitive interpretation of those two provisions—about which you did not ask—it is our view that neither provision dictates an interpretation that the physicians-only requirement in HG § 20-208 must extend to medication abortions.

Starting with the immunity provision in HG § 20-209(d), we think a court might well interpret that provision, like HG § 20-208, not to apply to medication abortions because the provision's

---

[12] Delegate Green also mentioned in his testimony that a hospital would not admit a minor "for a tonsillectomy without the signature of a parent" and that "having an abortion is a far more serious operation." That reference to abortion as an "operation" could suggest that another purpose of the provision was to ensure that parents are informed before their children undergo a surgical procedure. But it seems unlikely that the surgical nature of an abortion was the sole reason that led the Legislature to believe that parental involvement was important in this context. After all, there is no requirement that parents be notified before a minor child undergoes a caesarian section, which is also a surgical procedure. *See* HG § 20-102 (providing that there is no requirement for a health care practitioner to notify parents about treatment related to "pregnancy," except for information about an abortion, when notice is generally required unless one of the grounds for bypass applies).

purpose seems to be to immunize physicians for decisions under the abortion statute that are unlikely to be relevant to medication abortions. More specifically, when HG § 20-209(d) grants a physician immunity as to the "decision" to perform an abortion "under this section" made "in the physician's best medical judgment," it is most likely referring to a decision about whether the fetus is "viable," which an earlier part of the same section expressly requires a physician to make in his or her "best medical judgment." HG § 20-209(a). Reading those two parts of the section together, the Legislature apparently wanted the physician to be immune for the "decision" to perform an abortion primarily because it felt that "the decision [as to viability] is in that doctor's medical opinion . . . not in the opinion of the medical community." Senate Floor Debate, S.B. 162, 1991 Leg., Reg. Sess.

In other words, the primary purpose of the immunity provision seems to be to protect a physician when the physician's decision as to viability would dictate whether a particular abortion is subject to any limitations that might exist under State law and that could, by extension, expose the physician to liability if the physician makes the "decision" to perform that abortion.[13] Medication abortions, however, are only available through 10 weeks of gestation—well before a fetus is likely to be considered viable, at least under current standards of medical practice. *See* Matthew A. Rysavy et al., *Between-Hospital Variation in Treatment and Outcomes in Extremely Preterm Infants*, 372 New Eng. J. Med. 1801, 1801-11 (2015), https://www.nejm.org/ doi/full/10.1056/NEJMoa1410689. Thus, reading the immunity provision not to apply to medication abortions would not seem to conflict with that provision's primary purpose, although legislative clarification could be necessary if the standards of medical practice

---

[13] In addition to defining viability, § 20-209 provides that the State may not interfere with the decision of a woman to terminate a pregnancy after viability if (1) the termination procedure is necessary to protect the life or health of the woman or (2) the fetus is affected by genetic defect or serious deformity or abnormality. HG § 20-209(b)(2). Determining whether one of those conditions exists presumably requires a physician to exercise his or her medical judgment, and the Legislature may have intended the physician to be immune from liability for challenges based on those decisions as well. But, assuming that is the case, these judgments only become relevant to whether abortion is permissible under the statute if the physician has first decided that the fetus is viable because, before viability, the State may not interfere with a woman's decision to terminate her pregnancy. *See* HG § 20-209(b)(1).

evolve such that medication abortions become available later in pregnancy.[14] At the very least, the immunity provision is not so clear as to dictate that the physicians-only provision must be read to apply to medication abortions.

The parental-notification provision in HG § 20-103, however, may be more difficult to reconcile with our reading of HG § 20-208. Because a core purpose of the parental-notification provision is to ensure that parents can help their children decide whether to terminate a pregnancy (unless one of the express exceptions to notice applies), interpreting that provision to apply only to surgical abortions would seem to frustrate one of its key purposes—the same type of result we sought to avoid by interpreting HG § 20-208 not to apply to medication abortions. To give effect to the purposes of both the parental-notification and the physicians-only provisions, one possibility would be to interpret "perform an abortion" in HG § 20-103 differently from the similar phrase "an abortion must be performed" in HG § 20-208. As the Court of Appeals has explained, even when two statutes use the same words, those words can have different meanings if the purposes behind the two statutes are different. *See, e.g.*, *Whack*, 338 Md. at 674 (recognizing that "the meaning of the word 'convicted' varies depending upon the context and purpose of the particular statute in which it appears"); *Moore v. State*, 424 Md. 118, 139-40 (2011) (recognizing that a weapon did not have to be operable to come within the definition of "firearm" in one statute even if operability was required in another statute with "an altogether different objective"). That seems to be the case here. Whereas the purpose of the physicians-only provision is to protect the health and safety of women seeking abortions, the parental-notification provision reflects an entirely different purpose based more on the *result* of the abortion—the termination of a pregnancy—than on the precise means used to terminate the pregnancy. Given those divergent purposes, even if a court were to interpret the phrase "perform an abortion" in the parental-notification provision to apply to medication abortions, the physicians-only provision would not necessarily have to be interpreted the same way.

---

[14] To be clear, even if the immunity provision does not apply to medication abortions, a physician or other health care practitioner who is providing a medication abortion presumably would not be liable under ordinary principles of tort law for any conduct in connection with that abortion (including, most likely, the "decision" to perform the abortion) unless the practitioner fails to adhere to the applicable standard of care, a protection that seems to be largely the same as, if not identical to, the protection that would be offered by the immunity provision. *See* Bill Review Letter for S.B. 162 at n.3 (1991).

We recognize, though, that interpreting the phrase "perform an abortion" in the parental-notification provision differently from "an abortion must be performed" in the physicians-only provision could cause some practical complications. More specifically, because the parental-notification requirement applies only to a "physician"—a term that is expressly defined to mean "an individual who is authorized under the Maryland Medical Practice Act to practice medicine in this State," HG § 1-101(j)—it might not apply to other health care practitioners, even if those practitioners could provide a medication abortion under our interpretation of HG § 20-208. In other words, if the physicians-only provision is read to apply only to surgical abortions but the parental-notification provision is read to extend to medication abortions, a physician who is providing a medication abortion would have to follow the parental-notification provision in HG § 20-103, but a nurse practitioner, certified nurse midwife, or physician assistant might not. That differential treatment seems like a result the Legislature would not have intended.

In trying to resolve that complication and reconcile these provisions, a court would be left with three options, none of which is perfect. First, a court could interpret both provisions to apply to all methods of terminating a pregnancy, including both surgical and medication abortions. That would avoid the complication discussed above because only physicians would be able to provide medication abortions and, thus, it would make sense that only physicians would be required to follow the parental-notification provision before doing so. But such an interpretation would be inconsistent with the legislative history of HG § 20-208 and the apparent purposes of HG §§ 20-208 and 20-209 because it would erect barriers unrelated to health and safety for women to access a new method of terminating a pregnancy not contemplated at the time, even though that method can be provided safely by qualified nurse practitioners, certified nurse midwives, and physician assistants.

Second, a court could interpret both provisions to apply only to surgical abortions. That would again avoid complications because, although physicians and certain non-physicians would both be able to provide medication abortions, none of them would be required to follow the procedures in the parental-notification provision before doing so. But, just as the first option would be inconsistent with the purposes of HG §§ 20-208 and 20-209, such an interpretation would frustrate a core purpose of the parental-notification provision in HG § 20-103 by potentially leaving

parents unable to counsel their children about a medication abortion.

Third, a court could read the physicians-only provision to apply only to surgical abortions, while interpreting the parental-notification provision both to apply to medication abortions and to require that all health care practitioners comply with the provision's parental-notification procedures, even if the practitioners are not technically "physicians" as defined by the statute. That reading would be more consistent with the purposes of both the physicians-only and parental-notification provisions, but it would require reading a defined term—"physician"— differently from its statutory definition. Still, despite that further complication, it remains possible that a court would take this third approach. Although statutory definitions will almost always control the meaning of a defined term, *see, e.g.*, *Bryant v. State*, 393 Md. 196, 202 (2006), there are sometimes "unusual" circumstances when the statutory definition should not be applied so mechanically, such as when doing so would "create obvious incongruities in the language" and "destroy one of the major purposes" of the statute. *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); *see* 2A Norman J. Singer & Shambie Singer, *Sutherland Statutory Construction* § 47:7 (7th ed. 2014) (explaining the role of definition provisions); *see also Smith v. State*, 425 Md. 292, 299 (2012) (explaining that "results that are unreasonable, illogical, or inconsistent with common sense should be avoided with the real legislative intention prevailing over the intention indicated by the literal meaning" (citation and internal quotation omitted)).

Here, assuming that certain non-physicians can prescribe and provide to a patient the necessary drugs for medication abortions under the physicians-only statute, a mechanical application of the definition of "physician" to HG § 20-103 would not only threaten to destroy a core purpose of the parental-notification provision but would also "create obvious incongruities" with another provision that sets forth the general rule for providing notice to a parent about their child's pregnancy-related treatment. *See* HG § 20-102. Under that general provision, a "licensed health care practitioner may, but need not, give a parent, guardian, or custodian of [a] minor or the spouse of the parent information" about treatment involving the minor's pregnancy, "*except* information about an abortion," HG § 20-102(f) (emphasis added), which is instead governed by the parental-notification provision in HG § 20-103. Because the general provision in § 20-102(f) applies to any "licensed health care practitioner," not just a physician, it would necessarily apply

to a nurse practitioner, certified nurse midwife, or physician assistant who prescribes drugs for a medication abortion. And that provision's notification requirements include an express exception for "information about an abortion," in recognition of the fact that parental notification about an abortion is instead governed by HG § 20-103. *See* 1977 Md. Laws, ch. 961 (amending what is now HG § 20-102(f) to provide an exception for "information about an abortion" at the same time that the parental-notification provision in what is now HG § 20-103 was first enacted).[15] Thus, to avoid incongruities in the statutory scheme, HG § 20-102(f) could be read to suggest that, whenever "information about an abortion" is involved, any "licensed health care practitioner" must comply with the parental-notification provision in HG § 20-103, even though that provision—at least on its face—applies only to a "physician."

Of course, none of these three possible solutions is perfect, and we cannot say for sure how a court would reconcile the relevant provisions of the abortion statute. But we do not believe that a court would read the physicians-only statute to prohibit trained and licensed nurse practitioners, certified nurse midwives, and physician assistants who can safely provide medication abortions from doing so merely because the parental-notification statute, which was first enacted at a different time and has an entirely different purpose, may be best read to apply to medication abortions. In a situation like this one, when we are confronted with post-enactment changes in the world that the General Assembly may not have foreseen and did not seem to contemplate, we cannot always expect that the pieces of the statutory scheme will fit together like a jigsaw puzzle. And as to the particular piece of the scheme about which you asked—the physicians-only provision in HG § 20-208—the legislative history, the historical context, the legislative purpose, and the canon of constitutional avoidance all suggest that the Legislature intended that provision to apply only to surgical abortions. Thus, regardless of how the parental-notification provision (and the immunity provision) might be

---

[15] Because we are assuming under this third option for reconciling the physicians-only and parental-notification provisions that "abortion" in the parental-notification provision includes a medication abortion, we logically have to assume that the word "abortion" in HG § 20-102(f) does as well, given that HG §§ 20-102(f) and 20-103 are linked together. In any event, we note that the word "abortion" in HG § 20-102(f) is not used in conjunction with the word "perform" and may be more naturally read in this provision of the statute than some of the others to refer to all methods of terminating a pregnancy.

interpreted, it is our opinion that the physicians-only provision in HG § 20-208, though ambiguous, is best read not to apply to medication abortions.

To be clear, our conclusion does not mean that all nurse practitioners, certified nurse midwives, and physician assistants will necessarily be able to prescribe, dispense, or administer drugs for a medication abortion under all circumstances. We conclude only that the physicians-only requirement in HG § 20-208 does not categorically prohibit these non-physicians from providing the drugs for medication abortions when they are otherwise acting within their scope of practice. To be able to prescribe, dispense, or administer the drugs necessary for a medication abortion, these non-physicians must of course comply with any requirements within their respective licensing statutes and any applicable REMS established by the FDA. *See* Parts I.B and I.C, *supra*. We leave any unresolved questions about the scope of practice for these professionals to be resolved by the Board of Nursing and Board of Physicians, as appropriate.

### B.  Surgical Abortions

Your second question is whether HG § 20-208 prohibits a physician assistant from performing a surgical abortion under a delegation agreement with a supervising physician. We do not understand your question to be whether a physician may delegate certain tasks to a physician assistant during a surgical abortion in which the physician is personally involved. We instead understand you to be asking whether a physician may, in effect, "perform" a surgical abortion under HG § 20-208 by delegating the procedure—in its entirety—to a physician assistant. Your question, then, is essentially whether the requirement that "[a]n abortion must be performed by a licensed physician" in HG § 20-208 makes performing a surgical abortion a non-delegable act.

Although the language of HG § 20-208 is ambiguous as applied to medication abortions, there is no ambiguity that surgical abortions "must be performed by a licensed physician." The word "physician" is specifically defined for purposes of this provision to "mean[]" only a "person, including a doctor of osteopathy, licensed to practice medicine in the State of Maryland in compliance with the provisions of Title 14 of the Health Occupations Article." HG § 20-207; *see also Tribbitt v. State*, 403 Md. 638, 647-48 (2008) (noting that "when statutory drafters use the term 'means,'" they generally "intend the definition to be exhaustive"); COMAR 10.12.01.01B(4) (defining "physician" for purposes of the State's

regulations governing surgical abortion facilities as "an individual licensed to practice medicine in this State under Health Occupations Article, Title 14, Annotated Code of Maryland"). And that definition, by its express terms, does not include a physician assistant. Although physician assistants are "licensed . . . to practice medicine *with physician supervision*," HO § 15-101(o) (emphasis added), they are not themselves "physicians"—they must instead practice under the supervision of one—and they are not licensed "in compliance with the provisions of Title 14 of the Health Occupations Article," HG § 20-207, but rather in compliance with the separate provisions in Title 15 of that Article.[16] In other words, the plain language of HG § 20-208 requires that a licensed physician, as defined, must perform a surgical abortion and makes no exception to that requirement for a physician assistant.

Nor do we think that a physician can "perform" a surgical abortion by having someone else do the surgery. Although "perform" can have more than one meaning, under any definition of the term, a physician only "performs" the procedure if the physician is actually involved in doing it. *See, e.g.*, *MacMillan Dictionary* 748 (1987) (defining "perform" as "to begin and carry out to completion"); *The Random House Dictionary of the English Language* 1439 (1987) (defining "perform" as "carry out; execute; do; . . . fulfill; . . . complete"). To be sure, a physician assistant is an "agent of the . . . supervising physician in the performance of all practice-related activities," HO § 15-301(e), and the supervising physician must agree in the delegation agreement to accept "responsibility for any care given by the physician assistant," HO § 15-302(b)(7). But that agency relationship does not convert a

---

[16] While Title 14 "does not limit the right of . . . [a]n individual to practice a health occupation that the individual is authorized to practice," HO § 14-102, neither does it convert an individual into a "physician" simply because that individual is authorized under a different title to perform acts that constitute the practice of medicine. In other words, the function of HO § 14-102 is to ensure that individuals practicing other health occupations are not deemed to be unlawfully practicing medicine without a license, s*ee* HO § 14-601, rather than to change the longstanding definition of "physician." *See* 1970 Md. Laws, ch. 736 (defining physician to include "person[s], including Doctors of Osteopathy, licensed to practice medicine in the State of Maryland in compliance with the provisions of this subtitle" but expressly providing that that the practice of medicine did not include "[p]racticing any profession otherwise registered, certified, or licensed and defined by law").

physician assistant into a "physician" as defined by the statute. *See* Restatement (Third) of Agency § 1.01 cmt. c (2006) ("Despite their agency relationship, a principal and an agent retain separate legal personalities."); *see also Dingle v. Belin*, 358 Md. 354 (2000) (concluding that patient stated a breach of contract claim when a resident physician "performed" the surgery instead of the surgeon who had been named on the consent form, even though the surgeon had delegated those duties to the resident). Just because a physician is responsible for the acts of a physician assistant does not mean that the physician has "performed" those acts; the physician assistant is still the one who has performed them.[17] In our opinion, therefore, a Maryland court would not conclude that a physician has "performed" an abortion under HG § 20-208 by delegating the procedure to a physician assistant.

In fact, the general rule under Maryland law seems to be that, when a statute outside of Title 14 of the Health Occupations Article provides that a physician is to perform a particular task, the physician may not delegate that task to a physician assistant. *See Rideout*, 149 Md. App. at 657-58; *see also* 80 *Opinions of the Attorney General* 173 (1995) (concluding, albeit in a somewhat different context, that physicians could not delegate the task of dispensing drugs in its entirety to a physician assistant); 44 *Opinions of the Attorney General* 300 (1959) (same with respect to nurses).[18] In *Rideout*, the Court of Special Appeals analyzed a provision in the State Personnel and Pensions Article that entitled

_____

[17] Although the Illinois Attorney General has concluded that a statute requiring abortions to be "performed" by physicians did not prohibit physicians in that state from delegating the task of *dispensing* drugs for a medication abortion to physician assistants, it appears that a physician would still have been involved in the process of providing the abortion in some way by ordering or prescribing the mifepristone for the patient. *See* Ill. Op. Att'y Gen. No. 18-001, 2018 WL 5930979 (Aug. 21, 2018); Ill. Op. Att'y Gen. No. 09-002, 2009 WL 596125 (Mar. 5, 2009). In that context, it makes sense to conclude that a physician can delegate part of the process to a physician assistant. *Cf.* 100 *Opinions of the Attorney General* 85, 97-98 (2015) (explaining that it can be permissible to delegate certain tasks related to the dispensing of drugs, even when delegation of the process in its entirety would be impermissible). But that does not mean that a physician may "perform" a surgical abortion by delegating the procedure in its entirety to a physician assistant.

[18] After our Office issued these two opinions, the General Assembly amended the law, and now nurse practitioners, certified nurse midwives, and physician assistants have authority under their respective licensing statutes to dispense drugs subject to certain conditions. *See* HO §§ 8-508, 8-601, 15-302.2.

State employees to accident leave if "a *physician* examines the employee and certifies that the employee is disabled because of the injury." 149 Md. App. at 657. The Court held that, because the statute specifically required the tasks at issue to be performed by a "physician," the physician could not delegate those tasks to a physician assistant, and the State could not rely on an examination by a physician assistant to determine the employee's entitlement to accident leave. *Id.* at 657-58. Although the Court recognized that physicians may generally delegate medical acts (including patient examinations) to physician assistants, the Court reasoned that physician assistants are not themselves physicians and that "the delegated performance of such acts by an assistant does not negate the plain language of [the accident-leave statute] that a physician examine an employee." *Id*. at 658. Applying the same reasoning here, the general authority of physician assistants to perform delegated medical acts does not negate the plain language of HG § 20-208 that a surgical abortion must be "performed" by a "licensed physician," as defined by HG § 20-207.[19]

We recognize, of course, that recent studies have concluded that physician assistants—and nurse practitioners and certified nurse midwives too, for that matter—can perform certain types of surgical abortions safely and effectively, if they have been trained on how to do so. *See* Nat'l Academies of Sciences, *The Safety and Quality of Abortion Care in the United States* at 14; Am. Pub. Health Ass'n, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 1, 2011). In that respect, there may be an argument that the physicians-only provision is no longer strictly necessary to fulfill its original purpose to protect the health and safety of women seeking abortions. *See* Letter from the ACLU of Maryland, Planned Parenthood of Maryland, NARAL Pro-Choice Maryland, and Women's Law Center of Maryland to

---

[19] Indeed, when other provisions outside of Title 14 of the Health Occupations Article required a "physician" to perform a certain task, the Legislature has found it necessary to amend those provisions to authorize non-physicians to perform the same tasks. *See* 2008 Md. Laws, ch. 233 (authorizing nurse practitioners to complete birth and death certificates, emergency medical services "do not resuscitate orders," and advance directives); 2013 Md. Laws, ch. 274 (authorizing physician assistants to do the same).

Patrick B. Hughes, Chief Counsel for Opinions & Advice (Nov. 12, 2019).[20]

But we are not at liberty to simply read the provision out of the Maryland Code. *See Bey*, 452 Md. at 265 (explaining that courts will neither "add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute" and will not "construe a statute with forced or subtle interpretations that limit or extend its application" (internal quotation omitted)). Instead, a court would likely presume that HG § 20-208 continues to mean *something*. *See, e.g.*, *State v. Pagano*, 341 Md. 129, 134 (1996) (reiterating that statutes must be read "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory" (internal quotation omitted)). And if that provision means anything, it is that only licensed physicians may perform surgical abortions. In fact, if the provision had been intended to prohibit non-physicians from performing surgical abortions only when they would not otherwise have been qualified to do so under the Health Occupations Article, then the provision might have been superfluous when enacted, because the Health Occupations Article already provided then (as it does today) that non-physicians may not perform an act that constitutes the practice of medicine—including the "[e]nding of a human pregnancy," HO § 14-101 (1991 Repl. Vol.)—unless they have authority to perform that act as part of the practice of a health occupation under that Article. *See* HO §§ 14-102(a), 14-601 (1991 Rep. Vol.).

To be sure, our reading of HG § 20-208 as applied to surgical abortions may be somewhat in tension with the broader purpose of the 1991 abortion statute, which was to protect access to safe abortions, not to erect barriers unrelated to health or safety. The broader abortion statute, after all, provides that "[e]xcept as otherwise provided in this subtitle, the State may not interfere with the decision of a woman to terminate a pregnancy" before the fetus is viable, HG § 20-209(b), and that the Maryland Department of Health may only adopt regulations governing abortion that are "both necessary and the least intrusive method to protect the life or health of the woman" and "not inconsistent with established

---

[20] These groups submitted comments to our Office about this opinion request in accordance with our ordinary practice to post pending opinion requests on our website and accept comments on those requests from any interested parties.

medical practice." HG § 20-209(c).[21] Although that broader purpose could suggest that the General Assembly wanted the physicians-only statute to evolve with changes in Maryland medical practice to allow non-physician professionals to perform surgical abortions if and when they became qualified to perform surgeries under other laws, the statutory definition of physician here is not phrased in the type of "broad general terms" that the Court of Appeals has said may "be capable of encompassing circumstances and situations which did not exist at the time of its enactment." *Kindley*, 289 Md. at 625. To the contrary, the definition of "physician," given how narrow and specific it is, suggests that the term's meaning was *not* intended to evolve with changes in the scopes of practice of other health care practitioners.

Although courts may, under unusual circumstances, read a statutorily defined term to mean something other than how it is defined, *see supra* at 28, we doubt that this would be one of those circumstances. In contrast to the parental-notification statute discussed above, which defined "physician" only by reference to the general definition of the term that applies to the entire Health-General Article, *see* HG § 1-101(j), the term "physician" for purposes of the physicians-only requirement is specifically defined in a separate provision that applies only to HG §§ 20-208 and 20-209. Given that the Legislature paid special attention to the meaning of "physician" in this particular provision, a court is even more likely than usual to find that the Legislature meant what it said in defining the term. What is more, unlike with the parental-notification statute, reading "physician" in line with its statutory definition here does not appear to create any "obvious incongruities in the language" of the statutory scheme. *Lawson*, 336 U.S. at 201.

Ultimately, given the plain language of HG § 20-208 and the decision in *Rideout* finding that the similarly plain language there

---

[21] To clarify, we do not think that there is any direct conflict between the *language* of these provisions in HG § 20-209 and the language of HG § 20-208. Although § 20-209(c) provides that *Department of Health regulations* must be "necessary and the least intrusive method to protect the life or health of the woman," the physicians-only requirement in HG § 20-208 is, of course, not a Department of Health regulation. And § 20-209(b) provides that, "*except as otherwise provided in this subtitle*" (which would include the physicians-only requirement in HG § 20-208), the State "may not interfere with the decision of a woman to terminate a pregnancy" under specified conditions. HG § 20-209(b) (emphasis added).

was dispositive, we think a Maryland court is unlikely to ignore the plain language here and substitute its own view about what the Legislature may have meant. *See Borchardt v. State*, 367 Md. 91, 129 (2001) (explaining that it is not the "function" of the courts to "substitut[e]" their "judgment of what the law *ought to be* for what the Legislature has said it *is*" (emphasis in original)). Although the plain meaning rule is "not absolute," *Fikar v. Montgomery County*, 333 Md. 430, 434 (1994) (internal quotation omitted), and a court thus may read the language of a statute—even language that seems at first blush to be clear—"in light of the Legislature's general purpose," *Frost v. State*, 336 Md. 125, 138 (1994), that does not give a court broad license to "rewrite a statute merely because of some judicial notion of legislative purpose." *Guttman v. Wells Fargo Bank*, 421 Md. 227, 239 n.4 (2011) (quoting *Kaczorowski*, 309 Md. at 516 n.4).

It is one thing to rely on the apparent purpose of the 1991 abortion statute to conclude that the physicians-only requirement does not extend to a new method of safely terminating a pregnancy that the General Assembly did not foresee at the time when the statute's language as applied to that method is ambiguous; it is quite another to ignore the unambiguous language of the statute as applied to the precise method of abortion that the Legislature had in mind when it enacted the statute. Put another way, the General Assembly's goal in enacting HG § 20-208 may have been to protect the health and safety of women seeking abortions, but that does not mean we can ignore the specific means by which the Legislature chose to effectuate that goal—requiring that surgical abortions be performed only by licensed physicians. If that requirement is now broader than strictly necessary to serve the General Assembly's original goal, it is for the General Assembly to amend the statute. For that reason, we do not believe that a Maryland court would read HG § 20-208 to permit other health care practitioners to perform surgical abortions, even if those practitioners might generally be qualified to perform similar types of surgical procedures safely and effectively.[22]

---

[22] Unlike with medication abortions, a Maryland court would be unlikely to rely on the canon of constitutional avoidance to reach a different outcome. *Contra* Wash. Op. Att'y Gen. No. 2019-1, 2019 WL 495734 (Feb. 1, 2019) (relying on the constitutional avoidance canon, at least in part, to support a conclusion that physician assistants in Washington may now perform surgical abortions). That is because, for the canon of constitutional avoidance to apply, the statute at issue must be "susceptible to two interpretations," *Lamone v. Lewin*, 460 Md. 450, 473 (2018), and the language of the statute here, at least as applied to

Nor, in our view, is a Maryland court likely to find that statutory changes in 1999 that broadened the authority of physician assistants, *see* 1999 Md. Laws, ch. 655, implicitly amended the requirement in HG § 20-208 that physicians must perform surgical abortions. Even assuming that those changes to the Health Occupations Article authorized physician assistants to perform surgical procedures that they would not have been authorized to perform before—which is not entirely clear to us—Maryland courts are loath to find that a later-enacted statute has implicitly amended or repealed an earlier one. *See, e.g.*, *Bell v. State*, 236 Md. 356, 367 (1964). Although the Washington Attorney General relied on a similar argument in concluding that physician assistants may now perform surgical abortions in that State, *see* Wash. Op. Att'y Gen. No. 2019-1, 2019 WL 495734, such implied amendments are "not favored" by the Maryland courts, which will resort to finding them only "in cases of manifest repugnancy or irreconcilable conflict" between the relevant statutes. *Bell*, 236 Md. at 367.

Instead, Maryland courts will first attempt to reconcile the potentially conflicting provisions, often "by viewing the more specific statute as an exception to the more general one." *Government Employees Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 132-33 (1993). And here the physicians-only requirement in HG § 20-208 is without question the more specific statute. It regulates who may perform surgical abortions in particular, while the Health Occupations Article merely outlines the scope of practice for physician assistants more generally. Thus, a Maryland

---

surgical abortions, is not. In any event, even if the canon were to apply, it would be more difficult to make the argument here than in the context of medication abortions because the Supreme Court has "repeated[ly]" declared that a state may limit the performance of surgical abortions to physicians. *Mazurek v. Armstrong*, 520 U.S. 968, 974 (1997) (citing prior cases). And although some states have privacy protections broader than those in the U.S. Constitution, *see Armstrong v. State*, 989 P.2d 364 (Mont. 1999) (concluding that a provision prohibiting physician assistants from performing abortions was unconstitutional under Montana's Constitution), the Court of Special Appeals has held that Maryland's constitutional protections for the right to privacy are, at most, in pari materia with the federal ones. *Doe v. Department of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 643 (2009); *see also* 74 *Opinions of the Attorney General* 19, 30-32 (1989) (concluding that, at least based on the law as it existed at that time, Maryland's Equal Rights Amendment, though broader than the federal Equal Protection Clause, would not prohibit laws restricting access to abortion).

court would likely view HG § 20-208 as a limited exception to the general authority of physician assistants to perform delegated medical acts under the Health Occupations Article, not the other way around. *Accord* Cal. Op. Att'y Gen. No. 90-926, 1991 WL 495463 (concluding that, despite the general authority of physician assistants under California law to perform "any procedure" consistent with the assistant's training, the abortion statute was "carefully crafted . . . to permit physicians, and physicians alone, to perform abortions" and, therefore, refusing to "accept the notion that the Legislature meant to gainsay [a] carefully tailored and highly specific determination" about abortion with a general determination about the scope of practice of physician assistants).[23]

As a final point, although a Maryland court would likely read the physicians-only requirement in HG § 20-208 to mean that physician assistants may not perform surgical abortions, that does not mean that a physician is prohibited from delegating certain tasks to a physician assistant during the physician's performance of an abortion. *Cf.* 100 *Opinions of the Attorney General* at 97-98 (finding that physicians may delegate certain tasks related to the dispensing of drugs, even though delegating the process in its entirety would be impermissible); Ill. Op. Att'y Gen. No. 09-002, 2009 WL 596125 (concluding that Illinois's physicians-only statute did not require physicians to "perform every aspect of patient care" when delegation was authorized by State law). We merely conclude that, under HG § 20-208, physician assistants cannot be delegated the performance of a surgical abortion in its entirety.[24]

### III
### Conclusion

In our opinion, a Maryland court would likely conclude that HG § 20-208 does not prohibit nurse practitioners, certified nurse

---

[23] In 2013, California amended its law to specifically authorize certain non-physicians, including physician assistants, to provide medication and aspiration abortions. *See* Cal. Bus. & Prof. Code § 2253.

[24] To be clear, even if HG § 20-208 did not make the performance of surgical abortions a non-delegable act, that would not automatically mean that physicians could delegate surgical abortions to a physician assistant under the Health Occupations Article. Instead, the Board of Physicians would first need to decide whether a surgical abortion involves "advanced duties" and, if so, the physician assistant would need to submit to the Board an application for approval of surgical abortion as an "advanced dut[y]." HO § 15-302(c).

midwives, or physician assistants from providing medication abortions but that the statute does prohibit a physician assistant from performing a surgical abortion.

> Brian E. Frosh
> Attorney General of Maryland
>
> Alan J. Dunklow
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice